Lawrence E. KELLER, Petitioner

v.

**STATE ETHICS COMMISSION,**
**Respondent.**

Commonwealth Court of Pennsylvania.

Argued Sept. 8, 2004.

Decided Nov. 1, 2004.

Douglas C. Maloney, Langhorne, for petitioner.

John J. Contino, Harrisburg, for respondent.

BEFORE: COLINS, President Judge, and McGINLEY, Judge, and PELLEGRINI, Judge, and FRIEDMAN, Judge, and LEADBETTER, Judge, and COHN JUBELIRER, Judge, and LEAVITT, Judge.

OPINION BY Judge McGINLEY.

Lawrence E. Keller (Keller) petitions for review of an order of the State Ethics Commission (Commission) which determined that Keller violated Section 1103(a) of the Public Official and Employee Ethics Act (Act), 65 Pa.C.S. § 1103(a). As mayor of the Borough of New Hope (Borough), Keller received payments for performing marriage ceremonies and deposited those funds into his personal bank account, which he ultimately donated to non-profit organizations and charities. The Commission ordered Keller to pay the Borough the sum of $1,503.09, the total remaining in

the bank account, within thirty days of the order.

Keller took office as mayor of the Borough on January 4, 1988. In his capacity as mayor, Keller received annual compensation ranging from $1,500.00 to $2,500.00. As mayor, Keller had the authority to perform marriage ceremonies. After he took office, he was approached by engaged couples to perform their marriage ceremonies. Keller informed the couples that he would perform the marriage ceremonies and requested in return that the couples provide him with the sum of $150.00 which he planned to donate to local non-profits or charities. Keller generally received $150.00, while some couples paid less and others paid more, depending upon their finances. Keller deposited the money he received in a personal savings account he maintained and controlled.

On or about April 20, 1998, Keller withdrew substantially all of the funds from the account. He retained the minimum balance necessary for the account to remain open. From that point forward the savings account was used exclusively for monies received for marriage ceremonies. Keller did not declare this money as income on his personal tax returns. At various times, Keller withdrew funds from the savings account and deposited them in his personal checking account and then wrote checks to various non-profits or charities in the New Hope area. Keller did not claim these donations as charitable deductions on his personal income tax return. Between April 1998, and December 2001, Keller received a total of $16,805.00. During that same period, he withdrew $15,225.70 which was donated to charitable, service or non-profit agencies in the New Hope area. A balance of $1,503.09 remained in the savings account at the commencement of the investigation. Kel-

ler agreed not to disburse any funds during the course of the investigation.

The Investigative Division of the Commission (Investigative Division) received a signed, sworn complaint that alleged that Keller violated the Act. After it reviewed the complaint, the Investigative Division completed a preliminary investigation. On December 6, 2001, the Investigative Division informed Keller by letter that it would begin a full investigation. On November 19, 2002, the Investigative Division served Keller with a complaint and alleged he "used the authority of his office for a private pecuniary benefit by accepting payment and fees for performing marriage services and depositing those funds into a personal account." Investigative Complaint, November 19, 2002, at 2; Reproduced Record at R3a. The parties entered into a stipulation of facts before the Commission in lieu of an administrative hearing and submitted briefs.

On July 8, 2003, the Commission determined that Keller violated the Act when he received payments for performing marriage ceremonies and deposited those funds in a personal bank account. The Commission ordered Keller to pay the balance of the savings account, $1,503.09, to the Borough within thirty days and informed him that non-compliance would result in the institution of an enforcement action. The Commission reasoned:

In applying Section 3(a)/1103(a) of the Ethics Act to the instant matter, there were uses of authority of office on the part of Keller. But for the fact that Keller was Borough Mayor, he could not have been in a position to perform the marriage ceremonies and receive payments for doing so.... That such payments were pecuniary benefits to Keller himself is to state the obvious. The question reduces to whether the pecuniary benefit was private. If there is an

authorization in law to receive such payments, then the pecuniary benefits would not be private. However, if there is no such authorization in law, then the receipt of those payments would be contrary to law and *private* pecuniary benefits.... On this question, the Borough Code must be reviewed.

. . . .

The Borough Code sets the maximum compensation for a mayor in a borough with a population of less than 2,500 persons at a maximum of $2,500 with the actual compensation set by ordinance. The mayor may not receive any additional compensation for any other public service in the borough. However, Keller received compensation for performing marriage ceremonies and deposited such payments into his personal bank account. These payments, being unauthorized in law, constituted private pecuniary benefits to Keller. Consequently, Keller violated Section 3(a)/1103(a) of the Ethics Act when he performed marriage ceremonies and received payments which he deposited into a personal bank account....

Adjudication, July 8, 2003, (Adjudication) at 9–10.

Keller raises four issues for consideration. First, Keller contends that he did not violate the Act because in performing marriage ceremonies he was not using the authority of the mayor's office for private pecuniary gain. Second, he contends that his request of $150.00 to perform a marriage ceremony was de minimis and did not violate the Act. Third, Keller contends that his actions did not violate the Act because he performed weddings for any member of the public without favoritism. Fourth, Keller contends that the Commission erred when it ordered him to pay restitution of $1,503.09 to the Borough because such a sanction is authorized only where a public official has received a financial gain.[1]

## I. Conflict of Interest.

Initially, Keller asserts that he did not engage in conduct which constitutes a conflict of interest under Section 3(a) of the Act[2] for two reasons: 1) the performance of marriage ceremonies by a mayor is not a use of the "authority of office" as defined in the Act[3] because it is neither necessary to the duties of a mayor nor unique to the office of the mayor and 2) he did not

---

1. This Court's review of a decision of the Commission is limited to determining whether necessary factual findings are supported by substantial evidence, an error of law was committed, or constitutional rights violated. *R.H. v. State Ethics Commission,* 673 A.2d 1004 (Pa.Cmwlth.1996).

2. Section 1103(a) of the Act, 65 Pa.C.S. § 1103, provides "No public official or public employee shall engage in conduct that constitutes a conflict of interest."

The term "conflict of interest" is defined in Section 1102 of the Act, 65 Pa.C.S. § 1102 as:
Use by a public official or public employee of the authority of his office or employment or any confidential information received through his holding public office or employment for the private pecuniary benefit of

himself, a member of his immediate family or a business with which he or a member of his immediate family is associated. The term does not include an action having a de minimis economic impact or which affects to the same degree a class consisting of the general public or a subclass consisting of an industry, occupation or other group which includes the public official or public employee, a member of his immediate family or a business with which he or a member of his immediate family is associated.

3. "Authority of office or employment" is defined in Section 1102 of the Act, 65 Pa.C.S. § 1102, as "[t]he actual power provided by law, the exercise of which is necessary to the performance of duties and responsibilities unique to a particular public office or position of public employment."

realize any private pecuniary benefit for himself, his family, or his business.

### A. Authority of Office.

■ With respect to the authority of the office of mayor, Keller asserts that Section 1029 of The Borough Code[4] which enumerates the duties of a borough mayor, excludes the authority to perform marriages. A mayor's authority to perform marriages is found in the Domestic Relations Code, 23 Pa.C.S. § 1503.[5] Because a marriage is so easily facilitated by so many different individuals, Keller argues that the authority to perform marriages is not a power "the exercise of which is necessary to the performance of duties and responsibilities unique to a particular public office" so that the performance of marriages does not come under the Act. Keller further argues that the Domestic Relations Code does not establish a duty for a mayor to perform marriage ceremonies; rather, it authorizes a mayor to perform them.

The Commission determined:

The arguments against a finding of violation raised by Keller are unavailing. As to the assertion that Keller did not use the authority of office because marriage ceremonies may be performed by many individuals and such action is not necessary for the performance of the duties and responsibilities unique to a mayor, we have held that taking action by virtue of being in a given public position constitutes a use of authority of office.... (Citations omitted).

Adjudication at 10.

This Court agrees with the Commission that Keller used the authority of his office. A borough mayor is vested with the authority to perform marriages under the Domestic Relations Code. Keller unpersuasively argues that because such a wide variety of public and religious officials are provided with the authority to perform marriages that it is, in reality, not a "power" at all. However, other than members of the judiciary, a mayor is the only public official authorized to perform marriages. This authority is unique to the office of mayor. The Act defines "Authority of office or employment" in Section 1102 of the Act, 65 Pa.C.S. § 1102, as "[t]he actual power provided by law, the exercise of which is necessary to the performance of duties and responsibilities unique to a particular public office or position of public

---

**4.** Act of February 1, 1966, P.L. (1965) 1656, 53 P.S. § 46029. Section 1029 of The Borough Code, 53 P.S. § 46029(1), provides:

It shall be the duty of the mayor:

(1) To preserve order in the borough, to enforce the ordinances and regulations, to remove nuisances, to exact a faithful performance of the duties of the officers appointed, and to perform *such other duties as shall be vested in his office by law or ordinance.* (emphasis added).

**5.** Section 1503(a) of the Domestic Relations Code, 23 Pa.C.S. § 1503(a), provides:

(a) **General Rule.**—The following are authorized to solemnize marriages between persons that produce a marriage license issued under this part:

(1) A justice, judge or district justice of this Commonwealth.

(2) A former or retired justice, judge or district justice of this Commonwealth who is serving as a senior judge or senior district justice as provided or prescribed by law.

(3) An active or senior judge or full-time magistrate of the District Courts of the United States for the Eastern, Middle or Western District of Pennsylvania.

(4) An active, retired or senior judge of the United States Court of Appeals for the Third Circuit who is a resident of this Commonwealth.

(5) A mayor of any city or borough of this Commonwealth.

(6) A minister, priest or rabbi of any regularly established church or congregation.

employment." A borough mayor has the unique authority, and the responsibility, to perform marriages as a use of his or her office.

The Commission did not err when it determined that Keller used the authority of his office.

### B. Private Pecuniary Benefit.

■ Next, Keller contends that because he did not receive any private pecuniary benefit for performing marriages he did not violate the Act. Although Keller admits he collected fees for performing marriages, deposited the fees in his own personal savings account and later disbursed the money to non-profits and charities in the Borough, he maintains this did not constitute a "private pecuniary benefit of himself, a member of his immediate family or a business with which he or a member of his immediate family is associated." 65 Pa.C.S. § 1102. Rather, Keller asserts that he received funds based on his representation that he would donate the funds to charity, thereby creating a resulting trust.[6] Under the resulting trust, Keller argues, he had a fiduciary duty to donate the funds to charities and only his failure to do so would result in self-dealing. Keller further argues that he did not receive any tax benefit for making the donations because he did not deduct the amount on his tax return.

The Commission made the following relevant findings of fact:

29. Contributions made to the organizations were listed as donations from Lawrence Keller.

a. When contributions were made from Keller, various press releases confirmed the donations were from Keller as the result of his receiving monies for performing wedding ceremonies.

b. When Keller made the donations, news media coverage was arranged to publicize Keller's contributions toward the organizations' fund raising efforts.

. . . .

32. Keller received a total of $16,805.00 in donations that related to performing marriage ceremonies between April 1998 and December 2001.

a. Keller performed the marriage ceremonies in his capacity as Mayor of New Hope Borough.

b. Keller deposited the funds into a bank savings account he controlled.

c. Keller made the decisions as to how these funds would be distributed.

. . . .

Adjudication, Findings, Joint Stipulation of Findings by the Parties Nos. 29, 32 at 7.

The Commission determined:

As to the assertion that the fees Keller collected from the couples created a 'resulting trust' has no merit since Keller took the fees and placed them into his own personal bank account over which he had exclusive control. Keller could then have used those funds for whatever purposes he chose. . . .

The argument that Keller did not receive prior pecuniary benefits because he subsequently donated the fees to charities is unavailing. Keller received financial gains when he deposited the funds into his personal bank account and then obtained political gain when he donated the monies to charities with Keller

---

6. "A resulting trust arises when a person makes a disposition of property under circumstances which raise an inference that he does not intend that the person taking or holding the property should have a beneficial interest in the property." *Fenderson v. Fenderson,* 454 Pa.Super. 412, 685 A.2d 600, 605 (1996), *petition for allowance of appeal denied,* 548 Pa. 670, 698 A.2d 594 (1997).

getting the credit/recognition for so doing. The controlling elements are the performance of marriage ceremonies by Keller followed by the deposit of the fees into his personal bank account when there was no authorization in law for him to do so. Such actions by Keller violated the Ethics Act. The subsequent actions by Keller to make payments to various charities did not retroactively undo the Ethics Act violation.... (Citations omitted).

Adjudication at 10.

Once again this Court must agree with the Commission. The parties stipulated that Keller accepted the money, made deposits into his own personal bank account and determined when, where, how much, and to whom the money went. There is no factual dispute. Based on the stipulations, the findings are supported by substantial evidence. The Commission did not err when it determined that Keller realized a private pecuniary benefit. He treated the amount he received as his own money. Although Keller ultimately gave away the money, he still obtained more than $16,000.00 in a four year period. Albeit that it was "donated," it was still for his personal use through the exercise of the authority of his office. Proportionately, it was well in excess of his maximum salary of $2,500 as authorized in Section 1025 of The Borough Code, 53 P.S. § 46025.[7]

The Commission found that when contributions were made by Keller to charities, press releases confirmed that the donations were from Keller. These donations enabled Keller to garner favorable publicity which in a reelection campaign was of incalculable political value. Further, a Keller opponent would not have the same opportunity to get this free publicity unless he donated his own money rather than money which should have gone to the Borough. Apart from the political gain, the publicity from the donations enhanced Keller's standing in the community. This Court fully accepts the determination that Keller obtained at least political gain for the donations and that such donations did not "retroactively undo the Ethics Act violation." Adjudication at 10.

### II. De Minimis Economic Impact.

■ Keller next contends that even if his actions did constitute a conflict of interest, there was no violation of the Act because of the de minimis economic impact. Under Section 1102 of the Act, actions which have a de minimis economic impact are not a violation of the Act for conflict of interest. Again Keller misstates the obvious; during the four year period in question, Keller collected approximately $16,000.00 in donations. Keller argues that this total is misleading because the individual impact of each donation was negligible.

With respect to this issue, the Commission determined, "Keller's argument that his subsequent donations of the $150 marriage fees constituted a de minimis economic impact is baseless. Such fees which ranged in value from $50 to $1,000 per marriage ceremony are not de minimis." Adjudication at 11.

Again, this Court must agree. While the average fee was not overwhelming, it was not a meager or symbolic amount. Further, if Keller had deposited this amount with the Borough, the Borough's treasury would have been enriched by $16,000. This Court finds no error in the

---

7. Section 1025 of The Borough Code, 53 P.S. § 46025, provides in pertinent part, "The salary of the mayor shall be established by ordinance and shall not exceed, in boroughs with a population of less than five thousand, a maximum of two thousand five hundred dollars ($2500) per year."

Commission's conclusion that the impact was not de minimis. *See Kraines v. Pennsylvania State Ethics Commission*, 805 A.2d 677 (Pa.Cmwlth.2002), *petition for allowance of appeal denied*, 572 Pa. 761, 818 A.2d 506 (2003).

### III. Exclusion for General Public.

■ Keller also contends that his actions were excluded from the conflict of interest provisions of the Act because his actions affected the general public to the same degree. Keller asserts that his request of a $150.00 donation from each couple, while some gave more and some gave less, meant all were treated the same.

The Commission was not impressed with this reasoning:

> Finally, the assertion that the class/subclass exclusion to conflict applies because the fees affected the general public to the same degree has no merit. The action before us concerns the use of authority of office by Keller to collect the marriage fees; the after the fact donation of varying amounts to different charities is totally irrelevant to the issue of conflict.

Adjudication at 11.

Section 1102 of the Act, 65 Pa.C.S. § 1102, provides in pertinent part in the definition of conflict of interest: " 'Conflict' or 'conflict of interest' does not include an action ... which affects to the same degree a class consisting of the general public or a subclass consisting of an industry, occupation or other group which includes the public official or public employee, a member of his immediate family or a business with which he or a member of his immediate family is associated."

In *Kraines*, this Court addressed this exclusion. Judith Kraines (Kraines) had served as the county controller for Berks County (County). The Investigative Division of the Commission alleged in its complaint that Kraines used the authority of her office for the private pecuniary benefit of a member of her immediate family. Kraines's stamped signature was on county checks issued to her husband, Dr. Neil A. Hoffman, M.D. (Dr. Hoffman), a board-certified forensic pathologist, for pathologist fees which were in excess of the amounts set forth in a contract between Dr. Hoffman and the County. In 1989, Dr. Hoffman entered into a contract with the County to provide certain services, such as autopsy reviews, consultations, and medical opinions for attorneys and insurance companies, for a retainer of $7,000.00 per year. He also agreed to provide other services such as standard autopsies, forensic autopsies, x-rays, and court appearances based on certain rates. In 1995 and in 1998, Dr. Hoffman asked for and received an increase in the rate for a forensic autopsy. The County Commissioners did not approve the increase. *Kraines*, 805 A.2d at 678–679.

Dr. Hoffman and other pathologists from the Reading Hospital and Medical Center submitted invoices to the coroner's office for payment. The coroner then prepared a monthly report that detailed each invoice and sent the report to the County Commissioners, County budget director, and Kraines. Once the invoices were approved, they were forwarded to Kraines's office for payment. Kraines's office issued checks for Dr. Hoffman and the other pathologists. Kraines's signature was stamped on the checks along with the computer generated signatures of two County Commissioners, and the treasurer. Dr. Hoffman was paid fees in excess of the amounts set forth in the 1989 contract. The Commission issued a final adjudication and determined that Kraines violated Section 1103(a) of the Act because she used the authority of her office for the private pecuniary benefit of a member of her fami-

ly by her participation in the approval process of payments to her husband for pathology fees which were in excess of the 1989 contract. *Kraines,* 805 A.2d at 679–680.

Kraines petitioned for review with this Court. Kraines contended that Dr. Hoffman was a member of a subclass, industry or occupation in relation to work he performed on behalf of, and payments he received from the County. This Court agreed:

> Herein, Kraines' husband was a member of a subclass, industry or occupation in relation to work he performed on behalf of and payments he received from the County. Although the Commission maintains that Dr. Hoffman was in a class to himself as Dr. Hoffman was the only board-certified pathologist for the County and was the only pathologist who had a contract with the County, this distinction is illusory and does not separate Dr. Hoffman from the other members of his occupation—the pathologists at Reading Hospital performing autopsies for the County Coroner. Dr. Hoffman received the **same** payment as all other members of his occupation for performing autopsies. The record is void of any preferential treatment Dr. Hoffman received.... We, therefore, conclude that the class/subclass exclusion to the statutory definition of 'conflict of interest' applies to Dr. Hoffman, thereby negating a violation of Section 1103(a).

(Emphasis in original).

*Kraines,* 805 A.2d at 682.[8]

Based on our case law, the exclusions from the conflict of interest provisions do not apply to Keller.[9] In *Kraines,* the question was whether Dr. Hoffman was

---

**8.** Similarly, in *Pulice v. State Ethics Commission,* 713 A.2d 161 (Pa.Cmwlth.1998), *petition for allowance of appeal denied,* 557 Pa. 642, 732 A.2d 1211 (1998), this Court reversed the Commission's determination that John A. Pulice (Pulice) violated Section 3 of the Act of October 4, 1978, P.L. 883, *as amended,* 65 P.S. § 403 (the former Ethics Act) when he engaged in conduct that constituted a conflict of interest. The exclusions from the conflict of interest provisions were the same as in the current Act. Pulice was president of the Millcreek Township School District Board of Directors (Board). The Commission determined that Pulice violated the conflict of interest provisions of the former Ethics Act when he participated in Personnel Committee meetings to create a new position of assistant principal/athletic director and when he participated in the official Board action of voting on the appointment of his son-in-law to the new position. *Pulice,* 713 A.2d at 162. With respect to the appointment of the son-in-law, the Commission determined that Pulice's voting in favor of the appointment resulted in a pecuniary benefit to his daughter and son-in-law. *Pulice,* 713 A.2d at 164.

Pulice petitioned for review with this Court. Among the issues he raised was that the compensation to the son-in-law was excluded from the conflict of interest provisions because the compensation affected to the same degree a class that consisted of the occupation of assistant principal/athletic director. This Court agreed:

> In addition, the compensation to the son-in-law is excluded from being a pecuniary benefit compensation that affects to the same degree a class consisting of an occupation. The amount of the salary increase affected to the same degree every member of the class of school administrators classified as 'Assistant Principal/Athletic Director.' The increase was not in the form of a bonus or other individual increase. The Commission erred when it included such compensation within the definition of 'private pecuniary benefit.'

*Pulice,* 713 A.2d at 167.

**9.** This Court notes that although Keller lists this issue in his Statement of Questions Involved, he devotes only a few paragraphs to it in his brief. This Court does not fathom how Keller would believe that his situation was the same as Kraines's where her husband received the benefit attributable to all pathologists.

668

treated the same as other pathologists.[10] The salient point to determine was whether the person receiving the benefit was part of the general public or a specific class. Here, Keller, himself, received the benefit. He was not in the same class as the couples he married. Further, the general public did not receive any benefit. Keller was the only person to directly benefit from the couples' payments. The Commission did not err when it determined that these exceptions did not apply.

## IV. Restitution.

Finally, Keller contends that the Commission erred when it ordered him to pay the $1,503.09 left in his savings account at the commencement of the investigation to the Borough because that violated the resulting trust established by Keller's representation to the couples and because Keller again maintains he realized no financial gain. Keller claims that the Borough has no claim to the money because it was not taken from the Borough treasury and the Borough has never passed an ordinance that established a fee schedule for the mayor's performance of weddings.

The Commission determined:

Section 1107(13) of the Ethics Act [11] empowers this Commission to impose restitution in instances where a public

official/public employee has obtained a financial gain in violation of the Ethics Act. Restitution is warranted in this case. Because Keller collected marriage fees in the amount of $16,805.00 which went into his personal account, the private pecuniary benefit that Keller received in violation of Section 3(a)/1103(a) of the Ethics Act was that amount. Although there is certainly a legal basis for imposing restitution of $16,805.00, we will in the exercise of our discretion limit the payback by Keller to the amount of collected fees that remain in his personal bank account, $1,503.09, the balance left after the various payments to the charities. Accordingly, Keller is directed within 30 days of the date of mailing of this Order to make payment of $1,503.09 through this Commission to New Hope Borough. Compliance with the foregoing will result in the institution of an order enforcement action.

Adjudication at 11.

This Court agrees. Keller gained over $16,000.00 through the performance of marriage ceremonies which he was authorized to perform as a power of his office. Keller received a private pecuniary benefit and obtained financial gain in violation of the Act. Under the Act, the Commission

10. In *Pulice,* the question was whether the son-in-law was treated the same as other school administrators in the same class of assistant principal/athletic director. As in *Kraines,* this Court does not understand how Keller equates his situation with that in *Pulice.*

11. Section 1107 of the Act, 65 Pa.C.S. § 1107(13), provides in pertinent part:
   [T]he commission shall:
   . . . .
   (13) Issue findings, reports and orders relating to investigations initiated pursuant to section 1108, which set forth the alleged violation, findings of fact and conclusions

of law. An order may include recommendations to law enforcement officials. An order resulting from a finding that a public official or public employee has obtained a financial gain in violation of this chapter may require the restitution plus interest of that gain to the appropriate governmental body. The commission or the Office of Attorney General shall have standing to apply to the Commonwealth Court to seek enforcement of an order requiring such restitution. This restitution requirement shall be in addition to any other penalties provided for in this chapter.

had the authority to order him to pay restitution.

Accordingly, we affirm.

### ORDER

AND NOW, this 1st day of November, 2004, the order of the State Ethics Commission in the above-captioned matter is affirmed.

Dissenting Opinion by Judge FRIEDMAN.

Because I believe that the record fails to establish that Lawrence E. Keller (Keller) used the authority of his office to obtain any private pecuniary benefit, I respectfully dissent.

As mayor of the Borough of New Hope (Borough), Keller was authorized,[1] but not required,[2] to perform marriage ceremonies. When approached by engaged couples to perform their marriage ceremonies, Keller requested that they tender to him the sum of $150.00 which he would donate to local non-profits or charities. Keller deposited these funds into a personal savings account used exclusively for the monies he received for performing marriage ceremonies. Between April 1988 and December 2001, Keller received and deposited a total of $16,805.00 into that account; during the same period, he withdrew $15,225.70, which he donated to charitable, service or non-profit agencies in the New Hope area.[3] The contributions were listed

as donations from Keller, but he took no tax deductions for them. Keller received favorable publicity for these contributions and, presumably, political gain.

The State Ethics Commission (Commission) determined that Keller's conduct violated section 1103(a) of the Public Official and Employee Ethics Act (Act), 65 Pa.C.S. § 1103(a), which states that "[n]o public official or public employee shall engage in conduct that constitutes a conflict of interest." The majority affirms the Commission's decision, despite the fact that Keller's conduct does not fall within the type of conduct prohibited by the Act.

The Act defines "conflict of interest" as a public official's use of the "*authority of his office*" for the "*private pecuniary benefit*" of the public official, his family, or a business with which he or his family is associated. Section 1102 of the Act, 65 Pa.C.S. § 1102. The record reflects that Keller neither used the "authority of his office" nor received any "private pecuniary benefit."

Under the Act, the phrase "authority of office" means "the actual power provided by law, the exercise of which is necessary to the performance of duties and responsibilities unique to a particular public office." *Id.* Because the Domestic Relations Code also authorizes active, senior and retired judges, and ministers, priests and rabbis, to perform marriage ceremonies, I cannot agree with the majority that the authority

---

1. Under section 1503(a) of the Domestic Relations Code, 23 Pa.C.S. § 1503(a), *authority* to perform marriage ceremonies is vested in: active, senior and retired judges; city or borough mayors; and ministers, priests and rabbis of any regularly established church or congregation.

2. The duties of mayor are set forth in section 1029(1) of the Borough Code, Act of February 1, 1966, P.L. (1965) 1656, *as amended,* 53 P.S. § 46029(1), as follows: to preserve order in the borough; to enforce the ordinances and regulations; to remove nuisances; to exact a faithful performance of the duties of the officers appointed; and "to perform such other *duties* as shall be vested in his office by law or ordinance." (emphasis added).

3. Keller left the remaining balance undistributed after learning that the State Ethics Commission was investigating a complaint about this activity.

of a mayor is unique in this respect. More important, the performance of marriage ceremonies cannot be "necessary to the performance" of Keller's "duties and responsibilities," where the mayor is only permitted, but not required by law, to so act. In reaching a contrary conclusion, I believe the majority confuses the concepts of authority and duty when it states that the mayor has the "responsibility" to perform marriage ceremonies. (Majority op. at 663–64.)

Moreover, the record is devoid of evidence that Keller's conduct resulted in a "private pecuniary benefit." Although the Act does not define this term, the legal meaning of "pecuniary benefit" is "[a] benefit capable of monetary valuation." Black's Law Dictionary 167 (8th ed.2004). The majority affirms the Commission's determination that Keller "received financial gains when he deposited the funds into his personal bank account and then obtained political gain. . . ." (Majority op. at 9.) However, there is absolutely no evidence that Keller benefited *financially,* and no suggestion that he ever intended to benefit financially, from his conduct. In determining otherwise, I believe that the Commission and the majority mistakenly equate political gain with financial benefit. I recognize that in our society, concepts of political gain and pecuniary gain may appear inextricably intertwined. Nevertheless, as a matter of law, they remain distinct. And this distinction is not only significant, but central to the very purpose of the Act, which declares at the outset that "any effort to realize personal *financial* gain through public office other than compensation provided by law is a violation of [the public] trust." Section 1101.1(a) of the Act, 65 Pa.C.S. 1101.1(a) (emphasis added).

Similarly, section 1107(13) of the Act, 65 Pa.C.S. § 1107(13), authorizes the Commission to order restitution to the appropriate governmental body only where the Commission finds that a public official has obtained a *financial gain* in violation of the Act. Indeed, the Act specifically states that an order based on such a finding "may require the restitution plus interest of *that gain.*" *Id.* (emphasis added). Because Keller received no financial benefit from performing marriage ceremonies, I also believe that the Commission lacked authority to order Keller to pay to the Borough the $1,503.09 that was intended by Keller and the contributing couples to be used for charitable purposes.

In reviewing the Commission's decision, this court must consider whether all the facts found by the Commission constitute *clear and convincing proof* that the public official violated the Act. *Kraines v. Pennsylvania State Ethics Commission,* 805 A.2d 677 (Pa.Cmwlth.2002), *appeal denied,* 572 Pa. 761, 818 A.2d 506 (2003). I believe that the facts of this case fall far short of the evidence necessary to prove a violation of the Act, and, accordingly, I would reverse.

## Dissenting Opinion by Judge LEAVITT.

I join Judge Friedman's dissent.[1] I write separately to note additional flaws in the Ethics Commission's position and the confusion it will cause.

The purpose of the Ethics Act is to preserve the public trust and thereby increase the confidence of Pennsylvania citizens in their state and local governments. This goal has been expressed by the General Assembly as follows:

> gain as those terms have been carefully defined by the legislature.

---

**1.** Judge Friedman's decision is firmly rooted in the Ethics Act. Keller did not use the "authority" of his office for "private pecuniary"

Declarations.—*The Legislature hereby declares that public office is a public trust and that any effort to realize personal financial gain through public office other than compensation provided by law is a violation of that trust.* In order to strengthen the faith and confidence of the people of this Commonwealth in their government, the Legislature further declares that the people have a right to be assured that the financial interests of holders of or nominees or candidates for public office do not conflict with the public trust. Because public confidence in government can best be sustained by assuring the people of the impartiality and honesty of public officials, this chapter shall be liberally construed to promote complete financial disclosure as specified in this chapter. *Furthermore, it is recognized that clear guidelines are needed in order to guide public officials and employees in their actions.* Thus, the General Assembly by this chapter intends to define as clearly as possible those areas which represent conflict with the public trust.

65 Pa.C.S. § 1101.1(a) (emphasis added). By affirming the Ethics Commission's ad-

judication, the majority concludes that Keller has violated the public trust.

The Ethics Commission reached its conclusion by way of a strained reading of the Borough Code. First, it held that Keller had a "duty" under the Borough Code to perform wedding ceremonies.[2] The Ethics Commission was on equally infirm ground when it found that Keller violated the compensation limit established in the Borough Code. Keller's annual salary of $2,500 does not include compensation for officiating at weddings because that is not a "duty imposed" by The Borough Code.[3] At the same time, the Borough Code does not proscribe a mayor from receiving compensation for services unrelated to the specific duties enumerated in The Borough Code.

In support of its position that Keller reaped a private pecuniary benefit,[4] even though the funds he received were given to charity, the Ethics Commission relies heavily on "the specific debate of the General Assembly on this exact issue." Ethics Commission's Brief at 23. This debate occurred during reenactment of the Ethics Act in 1989 and centered on a proposed amendment that would have permitted a public official to accept an honorarium in the form of a donation directed to a partic-

2. Sections 1028 and 1029 of The Borough Code, Act of February 1, 1996, P.L. (1965) 1656, *as amended*, 53 P.S. §§ 46028, 46029, establish the "duties" of a mayor. They are those expected of the executive branch: to administer the borough by enforcing ordinances. Under the rule of *ejusdem generis*, the catchall other duties in 53 P.S. § 46029 must be understood as advancing the executive branch functions. *See, e.g., Commonwealth v. Simmons*, 211 Pa.Super. 344, 236 A.2d 563, 565 (1968) (general expressions must be restricted to concepts similar to those specifically enumerated in preceding language). Administering wedding vows does not "pertain" to borough affairs or really have anything to do with borough governance.

3. Section 1025 of The Borough Code states: *The salary of the mayor shall be established by ordinance and shall not exceed, in boroughs with a population of less than five thousand, a maximum of two thousand five hundred dollars ($2500) a year. Such salara[y] shall be payable monthly or quarterly for the duties imposed by the provisions of this act.*
53 P.S. § 46025 (emphasis added). The authority to conduct weddings is an incident of office, not a duty.

4. Because Keller donated all payments to charity this is not a gain under The Ethics Act. This is not to say that Keller did not realize taxable earned income, but that is a legal issue for other authorities. It is not a concern of the Ethics Commission.

ular charity.[5] The Ethics Commission argues that many of the concerns expressed by members of the General Assembly in rejecting the amendment are similar to the concerns raised by Keller's conduct, *i.e.*, that allowing a public official to serve as a conduit for a charitable contribution would amount to electioneering and could invite arbitrary decisions as to what is a qualified charitable organization.

First, this Court cannot rely on debate that occurs on the floor of the House or Senate as a tool for construing the Ethics Act.[6] Second, the Ethics Commission's argument on this point highlights an inconsistency in its position. A payment of $150 for performing a wedding is an "honorarium" within the common understanding of that term. However, the Ethics Commission did not charge Keller with violating the no-honorarium rule because the statutory definition of "honorarium" does not match the common understanding of that word.[7] Mysteriously, and inconsistently, the Ethics Commission did not feel so constrained by the statutory definition of "authority."

If the Ethics Commission believed that a mayor's acceptance of $150 for performing a wedding service—or directing $150 to a charity—violated the public trust, it should have adopted a regulation to announce that interpretation.[8] This would have permitted public comment on whether the interpretation was correct, and it would have given all public officials advance notice of what was expected by the Ethics Commission. Instead, the Ethics Commission chose to make this pronouncement in the context of an enforcement action against a single mayor more than 28 years after the first enactment of the Ethics Act.[9] Further, had the mayor suggested that persons he joined in marriage make a contribution directly to a charity, this also would have been a violation, in the view of the Ethics Commission.

The Ethics Act promises "clear guidelines" by which public officials may order their conduct in order to increase public confidence in government. Here, individuals who thought they were making a contribution to charity will, instead, be making a gift to the Borough of New Hope.[10] It

---

**5.** Section 1103 of the Ethics Act states unequivocally that "[n]o public official or public employee shall accept an honorarium." 65 Pa.C.S. § 1103(d). It defines "honorarium" as follows:

A payment made in recognition of published works, appearances, speeches and presentations and which is not intended as consideration for the value of such services which are nonpublic occupational or professional in nature. The term does not include tokens presented or provided which are of de minimis economic impact.

65 Pa.C.S. § 1102.

**6.** It is axiomatic that floor debates do not constitute legislative history for purposes of statutory interpretation. *Nemacolin, Inc. v. Department of Environmental Resources*, 115 Pa.Cmwlth. 462, 541 A.2d 811, 814–815 (1988).

**7.** The definition of "honorarium" in the Ethics Act is admittedly difficult to parse.

**8.** Further, regulation may save a statute from a vagueness challenge by providing the necessary specifics to an otherwise vague or overbroad statute. *See, e.g., Jones v. Foster*, 148 Pa.Cmwlth. 303, 611 A.2d 332 (1992).

**9.** Indeed, if it were so clear that the Ethics Act does not allow mayors to collect something for joining persons in marriage, it should not have taken the Ethics Commission a generation or so to discover this point.

**10.** This "remedy" further highlights the problems here. A true conflict of interest lies where, for example, a mayor, acting on behalf of the municipality he serves, lets a no-bid contract to his own construction company. A return of profits to the municipality makes perfect sense in that circumstance. By contrast, the affairs of the Borough of New Hope have been completely unaffected by Keller's conduct in conducting weddings.

is difficult to see how this switch will increase confidence in government. The Commission's adjudication, affirmed by the majority, has left the ethical waters in Pennsylvania muddied because of the premise that mayors have a "duty" to conduct weddings. Must mayors do so for free? May boroughs require their mayors to conduct services and charge for this "borough service" as a way to fill borough coffers? If a mayor declines to officiate at a wedding can he be compelled to do so by writ of mandamus?[11] We are a long way from the clarity promised by the legislature in the Ethics Act.

I would reverse.

Judge FRIEDMAN joins in the dissent.

---

**11.** In the first oral argument on this appeal, the Ethics Commission stated the belief that a mayor could be compelled to conduct weddings by writ of mandamus.